UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| THE DOLSEN COMPANIES, a Washington Corporation, et al., | NO. 1:16-CV-3141-TOR |
| Plaintiffs, | ORDER GRANTING DEFENDANTS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT; DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT |
| v. | |
| BEDIVERE INSURANCE COMPANY, f/k/a ONEBEACON, et al., | |
| Defendants. | |

BEFORE THE COURT is Defendants QBE Insurance Corporation and Unigard Insurance Company's Motion for Partial Summary Judgment (ECF No. 35); Defendants Bedivere Insurance Company and Armour Risk Management, Inc.'s Motion for Partial Summary Judgment (ECF No. 38); and Plaintiffs The Dolsen Companies, Cow Palace, LLC, and Three D Properties, LLC's Motion for Partial Summary Judgment (ECF No. 48). The Court heard oral argument from the parties on September 6, 2017. The Court has reviewed the completed record and

files herein, and is fully informed.  For the reasons discussed below Defendants'

Motions for Partial Summary Judgment (ECF No. 35; 38) are **GRANTED** and

Plaintiffs' Motion for Partial Summary Judgment (ECF No. 48) is **DENIED**.

## BACKGROUND

The instant action involves pollution and an attempt to get the insurance

companies to pay for the associated costs.  Plaintiffs, the Dolsen Companies, Cow

Palace, and Three D Properties, operated (and still operate) a concentrated animal

farm operation.  As a byproduct of Plaintiffs' operation, Plaintiffs had to process

millions of gallons of liquid manure.  Plaintiffs stored the manure in holding ponds

and spread it on their crops as fertilizer.  Unfortunately, the holding ponds

leaked—allowing the seepage of over 1.6 million gallons of untreated manure into

the groundwater annually.  ECF No. 37-14.  Further, the Plaintiffs put far too much

manure on the land—a state investigator documented that manure applied to frozen

fields was at least 12 inches deep.  ECF No. 43 at 2.  As a result, the manure

soaked the soil and entered the ground water table, contaminating the local water.

On or about February 14, 2013, Community Association for Restoration of

the Environment, Inc., a Washington non-profit corporation, ("CARE"), and

Center for Food Safety, Inc., a Washington D.C. non-profit corporation, filed a

complaint in the United States District Court for the Eastern District of

Washington against a number of dairies, including Plaintiffs.  ECF No.  1-2 at ¶

10.[1]  CARE alleged Plaintiffs over-applied manure and allowed the holding ponds

to leak, causing "significant environmental contamination of the soil and

groundwater."[2]  ECF No. 1-2 at 11-13.  CARE alleged this violated the Resource

Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.* ("RCRA"), the

Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11001 *et*

*seq.* ("EPCRA"), and the Comprehensive Environmental Response Compensation

and Liability Act, 42 U.S.C. § 9601 *et seq.* ("CERCLA").  ECF No. 1-2 at ¶¶ 11-

13.

Plaintiffs submitted a tender for defense and indemnity to its insurers, but

Defendants Bedivere Insurance Company, Armour Risk Management, QBE

Insurance Corporation, and Unigard Insurance Company denied coverage and did

not provide for Plaintiffs' defense.  Among other things, Defendants asserted the

duty to defend and indemnify had not been triggered because the absolute pollution

---

[1]     *Community Association for Restoration of the Environment et al. v. Cow Palace,* LLC, Case No. 2:13-CV-3016-TOR (the "CARE Litigation").

[2]     Specifically, CARE alleged that the manure contained nitrates that entered the water table and migrated away from Plaintiffs' land and into the wells of nearby residents and nearby surface waters.  ECF No. 1-2 at ¶ 14.

ORDER GRANTING DEFENDANTS' MOTIONS FOR
PARTIAL SUMMARY JUDGMENT; DENYING PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 3

exclusions contained in the respective policies exclude the asserted loss from coverage.

The parties to the CARE Litigation settled in May 2015. ECF No. 1-2 at ¶ 23. As a result of the litigation and settlement, Plaintiffs incurred extensive expenses. Plaintiffs now seek a declaratory judgment that Defendants had a duty to defend Plaintiffs in the Care Litigation and must indemnify Plaintiffs for the losses arising from the CARE Litigation. ECF No. 1-2 at ¶¶ 30-33. Plaintiffs also allege breach of contract, ECF No. 1-2 at ¶¶ 34-36, bad faith, ECF No. 1-2 at ¶¶ 37-39, and violations of the Washington Insurance Fair Conduct Act and Consumer Protection Act, ECF No. 1-2 at ¶¶ 40-49.

Defendants moved for Partial Summary Judgment on the duty to defend and indemnify (ECF Nos. 35; 38). Plaintiffs moved for Partial Summary Judgment (ECF No. 48) on the duty to defend. These issues are now before the Court.

## STANDARD FOR SUMMARY JUDGMENT

A movant is entitled to summary judgment if "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" where the evidence is such that a reasonable jury could find in favor of the non-moving party. *Id.* The moving party bears the

"burden of establishing the nonexistence of a 'genuine issue.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). "This burden has two distinct components: an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party." *Id.*

## GOVERNING LAW

A federal court sitting in diversity looks to the forum state's choice of law rules to determine the controlling substantive law. *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002). All events transpired in Washington and the Plaintiffs-insureds are located in Washington, so Washington law governs the interpretation of the insurance policies at issue. *See Mulcahy v. Farmers Ins. Co. of Wash.*, 152 Wash.2d 92, 100 (2004).

## STANDARD FOR REVIEW OF INSURANCE CONTRACT

Interpretation of an insurance contract is a question of law. *Quadrant Corp. v. Am. States Ins. Co.*, 154 Wash.2d 165, 171 (2005). In Washington, insurance policies are construed as contracts. *Id.* Courts consider the policy as a whole and give it a "fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance." *Id.* (internal quotation marks omitted; citations omitted). The court applies the "plain, ordinary, and popular meaning" of undefined terms. *Xia v. ProBuilders Specialty Ins. Co.*, 2017

WL 3711907, at *4 (Wash. Apr. 27, 2017) *originally published at* 188 Wash.2d

171 (2017), *as modified* (Aug. 16, 2017), *reconsideration denied* (Aug. 17, 2017).

"The contract will be given a practical and reasonable interpretation that fulfills the

object and purpose of the contract rather than a strained or forced construction that

leads to an absurd conclusion, or that renders the contract nonsensical or

ineffective." *Washington Public Utility Districts' Utilities System v. Public Utility

Dist. No. 1 of Clallam County*, 112 Wash.2d 1, 11 (1989) (citation omitted).

Importantly – *unless it does not comport with Washington law* – the court

must enforce clear and unambiguous policy language as written; the court may not

modify the policy or create ambiguity where none exists. *Quadrant*, 154 Wash.2d

at 171 (citation omitted); *Xia*, 2017 WL 3711907, at *4. The expectations of the

insured cannot override the plain language of the contract. *Quadrant*, 154

Wash.2d at 171 (citation omitted). Any ambiguities are construed in favor of the

insured; but a clause is ambiguous only "when, on its face, it is fairly susceptible to

two different interpretations, both of which are reasonable." *Id.* (citation omitted).

"Exclusions of coverage will not be extended beyond their 'clear and

unequivocal' meaning." *American Star Ins. Co. v. Grice*, 121 Wash.2d 869, 875

(1993) (quoting *McDonald Indus., Inc. v. Rollins Leasing Corp.*, 95 Wash.2d 909,

915 (1981). "When an insured establishes a prima facie case giving rise to

coverage under the insuring provisions of a policy, the burden is then on the

insurer to prove that a loss is not covered because of an exclusionary provision in the policy." *Id.* (citation omitted). While exclusions are strictly construed against the drafter, a strict application should not trump the plain, clear language of an exclusion. *Quadrant*, 154 Wash.2d at 172 (citation omitted).

DISCUSSION

At issue in the Motions for Summary Judgment is whether Defendants have a duty to indemnify and defend Plaintiffs in the underlying action.

## I.  Duty to Indemnify

A duty to indemnify the insured arises when the insurance policy *actually* provides coverage for the loss. *Xia*, 2017 WL 3711907, at *4 (citation omitted).

The parties do not dispute that the losses – barring application of the absolute pollution exclusion – would be covered under the relevant insurance policies, which provides coverage for losses the insureds are legally obligated to pay. However, the parties dispute: (1) whether the losses are excluded from coverage under the policies' absolute pollution exclusion and (2) whether, even if the exclusion is triggered, coverage still lies because another covered occurrence was the "efficient cause" of the polluting event. These disputes are determinative: if the absolute pollution exclusion does not apply, the claim is covered; if the exclusion does apply, the policy may still cover the loss if an otherwise covered

occurrence was the efficient cause of the excluded harm. *Xia*, 2017 WL 3711907, at *4 (citation omitted). The issues are addressed in turn.

      a. <u>The absolute pollution exclusion applies</u>

Absolute pollution exclusions generally purport to exclude from coverage all losses related to pollution. In Washington, absolute pollution exclusions are enforceable and apply to losses arising from (1) a pollutant (2) *acting as a pollutant*. *Quadrant*, 154 Wash.2d at 178.

The absolute pollution exclusion arose "in the wake of expanded environmental liability under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980[.]" *Kent Farms, Inc. v. Zurich Ins. Co.,* 140 Wash.2d 396, 400 (2000). "These clauses were clearly intended to exculpate insurance companies from liability for massive environmental cleanups required by CERCLA and similar legislation." *Id.* at 401 (citation omitted); *see also Xia* 2017 WL 3711907, at *3 (absolute pollution exclusions "specifically address those situations in which the injury was caused by environmental damage.") (citing *Kent Farms*, 140 Wash.2d at 401)).

Absolute pollution exclusions have been found unambiguous in the context of noxious and toxic fumes from a sewage plant, *City of Bremerton v. Harbor Ins. Co.*, 92 Wash. App. 17, 19-23 (1998); hazardous fumes from sealant, *Cook v. Evanson*, 83 Wash. App. 149, 154 (1996) and *Quadrant*, 154 Wash.2d at 173; and

poisoning from carbon monoxide, *Xia*, 2017 WL 3711907, at *6. In *Xia*, the Washington Supreme Court noted that the "broad language of the pollution exclusion could easily lead to ambiguity in the case of such defined pollutants as noise and light[,]" but did not make any further comment as to when the clause would be ambiguous. *Id.* at *7.

The absolute pollution exclusions at issue here are unambiguous in the present context. Among other things, the policies exclude from coverage any liability arising out of: (a) the actual, alleged, or threatened discharge, dispersal, seepage, migration, release or escape of pollutants: (i) at or from the premises; and (ii) at or from any site or location used for the handling, storage, disposal, processing or treatment of waste.[3] The terms unambiguously apply to the dispersal, seepage, release and escape of pollutants, leaving the issue of whether the manure is a pollutant and whether it was acting as a pollutant (discussed below). Notably, the absolute pollution exclusion arose to mitigate the very type of losses at issue: contamination of land and water resulting in massive liability for clean-up and related costs pursuant to CERCLA and other legislation.

---

[3]     The policies all contain nearly identical provisions. *See*, *e.g.*, ECF Nos. 49-1 at 64 (One Beacon); 49-5 at 88 (QBE); 49-10 at 166 (Unigard). The differences are not material, and the parties have not suggested otherwise.

ORDER GRANTING DEFENDANTS' MOTIONS FOR
PARTIAL SUMMARY JUDGMENT; DENYING PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 9

###### i. Manure is a pollutant when introduced to water

The respective policies define pollutants as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke vapor, soot, fumes, acids, alkalis, chemicals, and waste. Waste includes materials to be recycled, reconditioned or reclaimed." *See*, *e.g.*, ECF Nos. 39-8 at 44 (One Beacon); 39-5 at 59 (QBE); 39-10 at 93 (Unigard). Given the inclusion of contaminate, irritant, and waste, nearly anything can be a pollutant in the right context—*e.g.*, anything that would be undesirable to add to your drinking water. *See Pipefitters Welfare Educational Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1043 (7th Cir. 1992) ("The terms 'irritant' and 'contaminant,' when viewed in isolation, are virtually boundless, for 'there is virtually no substance or chemical in existence that would not irritate or damage some person or property.'") (quoting *Westchester Fire Ins. Co. v. City of Pittsburg,* 768 F.Supp. 1463, 1470 (D. Kan. 1991)).

Manure clearly falls under the definition of a pollutant as waste. While the parties quibble over whether the manure is "waste," Plaintiffs essentially concede the point—Plaintiffs state in their briefing: "[i]f the Insurers sought to exclude coverage for property damage . . . arising from manure, it could have added . . . agricultural waste, or some other similar term to the definition of 'pollutant'[,]" ECF No. 53 at 7; and, referencing what the insurer could have done, state "the Insurers did not add 'animal waste' . . . to its generic and ambiguous definition,"

ECF No. 53 at 9.  Plaintiffs' counsel again stated at oral argument that the insurers could have added "animal waste" to exclude coverage.  The policy does not distinguish between types of waste.  Animal and agricultural waste is waste.

Plaintiffs argue the manure is not waste because it was going to be used as fertilizer, suggesting waste only means material that cannot be used—*i.e.*, garbage.  Although not defined in the policy, the Merriam Webster Dictionary defines waste as "refuse from places of human or animal habitations: such as (1) garbage, rubbish (2) Excrement—often used in plural (3) Sewage."  www.merriam-webster.com/dictionary/waste.[4]  Clearly, the common use of waste includes material that is purely garbage, but it also includes excrement and sewage.  Plaintiffs' proposed definition of waste (restricting the definition to materials that cannot be used) does not comport with the policy language: the policy specifically includes materials to be recycled, reconditioned or reclaimed, so a broader reading including both uses must follow.  This means waste must include manure (excrement) even if the manure will eventually be used (*i.e.*, recycled / reconditioned) for fertilizer.

---

[4]     "To determine the ordinary meaning of an undefined term, our courts look to standard English language dictionaries."  *Boeing Co. v. Aetna Cas. and Sur. Co.*, 113 Wash.2d 869, 877 (1990).

ORDER GRANTING DEFENDANTS' MOTIONS FOR
PARTIAL SUMMARY JUDGMENT; DENYING PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 11

Plaintiffs point to the case of *Littleton v. Whatcom County* to argue waste does not include manure, but the context of that case is much different than the instant action and is thus inapplicable. The court in *Littleton* was tasked with reviewing Washington legislation regulating "solid waste" and the corresponding statutory definition of such. 121 Wash. App. 108, 114 (2004). The court found solid waste did not include manure under the statute because – although originally included – subsequent legislation removed the phrase "manure, vegetable or animal solid and semisolid wastes, and other discarded materials" from the definition of solid waste. *Id.* The court thus presumed the legislature did not want manure to be so classified. *Id.* The court noted that a contrary reading would criminalize the use of manure as fertilizer without a permit and reasoned that the legislature could not have intended this consequence. *Id.* at 114-115. This presents a much different analytical framework than the instant case involving the interpretation of an insurance contract.[5]

_____

[5]     Notably, the court in *Littleton* references WAC 173-304-015(5), which states that the regulations do not apply to solid wastes, including "[a]gricultural wastes, limited to manures and crop residues, returned to the soils at agronomic rates[.]" *Id.* at 115. Consequently, the statutory framework actually supports a reading that solid waste includes agricultural wastes and such includes manure. Otherwise the

ORDER GRANTING DEFENDANTS' MOTIONS FOR
PARTIAL SUMMARY JUDGMENT; DENYING PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 12

Moreover, irrespective of whether manure falls under waste, manure is clearly a potential contaminate. Plaintiffs contend that including manure in the definition takes the reach of irritant and contaminate to the extreme, ECF No. 53 at 5, and that doing so would lead to an absurd conclusion, ECF No. 53 at 6. The Court does not agree. Although manure may make great fertilizer, there is no disputing that it is a contaminant if it makes its way into drinking water. Manure in water is clearly a contaminant—*i.e.*, it made the water unfit for use by introduction of unwholesome or undesirable elements. *See* www.merriam-webster.com/dictionary/contaminates.

Plaintiffs argue the insured would not expect to have a large part of their operation not covered, but the court in *Cook* expressly declined to adopt this line of reasoning when it declined to read "routine workplace torts" out of the exclusion—the Court reasoned that the exclusion does not create such a distinction for the insured's business operations while noting that it is difficult to image why an

_____

regulation would not have to spell out this latter exclusion. Ultimately, however, *Littleton* is of little to no import in the instant case—legislative definitions are crafted to meet a certain end rather than to parallel the common understanding of the term.

insured would take pollutants to a work site (a covered location) if it did not use it in its business. 83 Wash. App. at 154. Moreover, "Washington has never adopted the reasonable expectation policy." *Id.* at 155. Rather, Washington courts "consider how a reasonable person would interpret the policy's language, but do not allow an insured's expectations to override the plain language of the contract." *Id.* at 155 (citation omitted).

Plaintiffs further argue that the average insured purchasing an Agri-policy would not consider manure held in a storage lagoon, composted, or applied to cropland an irritant or a contaminant, ECF No. 53 at 4, but this misses the point. The question is whether a reasonable purchaser of insurance would label manure as a contaminant in the context of the actual harm – *i.e.*, when entering water. *See American Star*, 121 Wash.2d at 877-78 (considering whether average insurance buyer might reasonable conclude there is coverage in specific context of loss). No reasonable person can seriously deny manure is a pollutant in that context. At the end of the day, as CARE alleged, Plaintiffs' use and storage of the manure caused "significant environmental *contamination* of the soil and groundwater[.]" ECF No. 1-2 at ¶ 11-13 (emphasis own). Only contaminants contaminate.

Plaintiffs concede the definition of pollutant is broad and argue that this leads to an ambiguity. ECF No. 53 at 4. This is far from the case. A broad definition only makes it clearer that the harm at issue is excluded. Although waste

may also refer to material not to be reused, this does not create an ambiguity. An ambiguity arises when a term is subject to multiple interpretations—*i.e.*, choosing between interpretation A or B; a term is not ambiguous where there is one reasonable interpretation and such includes multiple uses of the term—*i.e.*, one interpretation that includes A and B. For example, the policy defines pollutant as an irritant and contaminant, but the existence of two subcategories does not create an ambiguity merely because a pollutant includes both irritants and contaminates.

At oral argument Plaintiffs emphasized that manure is not a pollutant when used as intended. It is unclear from case law whether this is truly a requirement for the exclusion to apply.[6] Irrespective, even if a necessary element, the manure can be – and, here, clearly is – a pollutant when used as Plaintiffs intended. Plaintiffs

---

[6]     Indeed, this may conflict with the case of *Bremerton*, where fumes from sewage triggered the absolute pollution exclusion. 92 Wash. App. at 23. Notably, naturally occurring materials like sewage and manure do not appear to fit under an "intended use" analysis because the material was not created with an intended use, although it may later be put to an intended use. This contrasts with a sealant, which is created for a specific end. As a result, it is unclear what the intended use of sewage and manure is other than what the user subjectively intended to do with the material.

ORDER GRANTING DEFENDANTS' MOTIONS FOR
PARTIAL SUMMARY JUDGMENT; DENYING PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 15

stored the manure and spread it on the land intending to use it as fertilizer.  Yet, the

very storage and application – the intended use – led to pollution.  As a result, even

if this were a requirement, such is easily met.

Finally, Plaintiffs baldly assert the chemical drift liability provision does not

allow for the broad reading of pollutants.  ECF No. 53 at 15.  This is not correct.  If

anything, the claw-back of certain polluting events for certain forms of chemicals

demonstrates the breadth of the definition of a pollutant, as claw-back provisions

are necessarily less expansive than the exclusion itself.

ii.      *The manure was acting as a pollutant*

Although the definition of pollutant is recognizably broad, Washington has

tempered the breadth of the exclusion by limiting it to losses that arise from the

pollutant *acting as a pollutant*.  *Kent Farms*, 140 Wash.2d at 401.  This avoids the

concern that merely tripping over a container containing a pollutant would trigger

the exclusion.

For example, the absolute pollution exclusion applied in *Bremerton, Cook,*

*Quadrant* and *Xia*.  In *Bremerton*, the court found noxious odors and fumes created

by sewage fell under the exclusion because it was polluting nature of the sewage

that caused such odors and fumes.  92 Wash. App. 17, 19-23.  Similarly, in *Cook*

and *Quadrant*, fumes emitted from the application of sealant fell under the

exclusion because the toxic characteristic of the sealant caused the harm.  *Cook*, 83

Wash. App. at 153-4; *Quadrant*, 154 Wash.2d at 180. As in *Cook* and *Quadrant*, the absolute pollution exclusion was triggered in *Xia* when carbon monoxide leaked and harmed the residents because the harm was caused by the very attributes making the gas a pollutant. *Xia*, 2017 WL 3711907, at *4. In contrast, in the case of *Kent Farms*, the exclusion did not apply where a jet stream of gasoline caused bodily injury—the pollutant (the gasoline) was not acting as a pollutant in causing the harm. 140 Wash.2d at 401. The Supreme Court of Washington in *Xia* later distinguished *Kent Farms* from *Quadrant* by noting that the harm in *Kent Farms* would have arisen even if the gasoline was water, as the gasoline choked but did not pollute when causing the harm. *Xia*, 2017 WL 3711907, at *4.

Here, the manure was clearly acting as a pollutant in contaminating the water. There is no lack of clarity on this issue. Had the manure been water, harm would not have resulted. Rather, it was the polluting properties of the manure that contaminated the water. This case is much different than *Kent Farms* and falls in line with *Bremerton, Cook, Quadrant*, and *Xia* because the very attribute making the material a potential pollutant caused the harm. This is not a case where someone drowned in the pool, or where a cascading flood of manure destroyed a building in its path. This is a case where the contaminating attributes of the manure directly polluted the surrounding soil and drinking water.

b. <u>Efficient Cause</u>

Washington applies the "efficient cause" rule to insurance coverage disputes. *Xia*, 2017 WL 3711907, at *5. "[T]he rule of efficient proximate cause provides coverage 'where a covered peril sets in motion a causal chain[,] the last link of which is an uncovered peril.'" *Id.* (brackets in original) (quoting *Key Tronic Corp. v. Aetna (CIGNA) Fire Underwriters Ins. Co.*, 124 Wash.2d 618, 625 (1994)). In other words, "[i]f the initial event, the 'efficient proximate cause,' is a covered peril, then there is coverage under the policy regardless [of] whether subsequent events within the chain, which may be causes-in-fact of the loss, are excluded by the policy." *Id.* (internal quotation marks omitted; citations omitted). *"However, the efficient proximate cause rule applies only 'when two or more perils combine in sequence to cause a loss and a covered peril is the predominant or efficient cause of the loss.'"* *Id.* (emphasis in original) (quoting *Vision One, LLC v. Philadelphia Indem. Ins. Co.*, 174 Wash.2d 501, 519 (2012)).

For example, in *Xia*, the court found the insurance policy provided coverage for damages resulting from a carbon monoxide leak, despite finding the exclusion applied to the carbon monoxide. 2017 WL 3711907, at *9. There, the leak was a direct result of the negligent installation of a water heater, which was a covered occurrence. *Id.* at *8-9. In contrast, in *Quadrant*, the court found the exclusion applied and there was no coverage because the initial peril that set in motion the

causal chain was the polluting event: the application of the sealant and the failure to contain the fumes. 154 Wash.2d at 167-68. Similarly the Washington Court of Appeals in *Bremerton* found an absolute pollution exclusion applied where the plaintiffs complained they were damaged from the "'emission of . . . noxious and toxic fumes' resulting from the City's 'negligent design, construction, and operation of the treatment plant.'" 92 Wash. App. at 19.

The distinguishing feature between these two lines of cases is the relation between the initial act and the pollutant causing harm—*viz.*, whether the initial peril was the polluting act (*i.e., whether the incident involved pollutants in the first place*) or whether the initial peril was some other act that incidentally led to a polluting harm. Although subtle, this framework is workable and leads to a clear result in this case: the initial act was intimately tied to the pollutant and thus the initial peril was the polluting act.

Defendants attempt to sidestep the analysis by arguing the "efficient" cause rule does not apply. In support, Defendants contrast the relevant policy language with the language of the policy in *Xia*—the instant policies use the term arising from as opposed to proximately caused by. Although the term arising out of is generally broader than proximately caused by – and the rule would not apply if freedom of contract governed without restriction – the court in *Xia* expressly disavowed attempts to circumvent the efficient cause rule with the "the use of

broad policy language which eliminates the relevance of the efficient proximate

cause rule under all possible circumstances." *Xia*, 2017 WL 3711907, at *8

(quoting *Findlay v. United Pacific Ins. Co.*, 129 Wash.2d 368, 376 (1996)).[7]  As a

consequence, the difference of language does not appear to be material.  Notably,

the use of broad language must be contrasted with the use of specific exclusions—

Washington courts do not limit "the use of clear policy language to exclude a

specifically named peril from coverage[.]"  *Id.*  "It is perfectly acceptable for

insurers to write exclusions that deny coverage when an excluded occurrence

initiates the causal chain and is itself either the sole proximate cause or the

efficient proximate cause of the loss." *Id*. at *5 (citations omitted).

Here, the initial act giving rise to the peril was an excluded harm and there is

no other covered occurrence that otherwise led to the harm.  In the instant case,

there are two sources of contamination: the over-application of manure directly to

the land and the inadvertent seepage of the manure from the holding ponds.  As to

---

[7]     The court in *Xia* gave examples of failed attempts to circumvent the rule,

including policy language stating: "We do not cover loss caused by . . . excluded

perils, whether occurring alone or in any sequence with a covered peril . . . " *Xia*,

2017 WL 3711907, at *5 (quoting *Safeco Ins. Co. of America v. Hirschmann*, 112

Wash.2d 621, 624 (1989)).

the over-application, there is but one relevant event: the application (*i.e.*, the release / dispersal) of the manure directly onto the land. This release of the pollutant falls squarely under the specific cause of pollution (the release / dispersal). Such exclusion of a "specifically named peril" – the release – is specifically sanctioned in *Xia.* 2017 WL 3711907, at *8 (quoting *Findlay*, 129 Wash.2d at 376) ("the use of clear policy language to exclude a specifically named peril from coverage" is not prohibited. "It is perfectly acceptable for insurers to write exclusions that deny coverage when an excluded occurrence initiates the causal chain and is itself either the sole proximate cause or the efficient proximate cause of the loss.").

As to the seepage via the holding ponds, Plaintiffs attempt to bifurcate the allegedly negligent construction of the holding ponds from the resulting pollution with the hope it will create a two-step pivot to coverage via the efficient cause rule. This attempt fails. It was the inadequate storage of the manure that caused the seepage—and the negligent construction is necessarily intertwined with the storage. This very occurrence is explicitly excluded by the terms of the policy, which excludes from coverage the seepage of pollutants stored or processed as waste. There is no other occurrence beside the act intimately tied with the storing of manure—the polluting event.

As a result, there is no coverage under the policy.  In both instances, the only acts Plaintiff can point to are the polluting events, which are intimately tied to Plaintiffs use and storage of the manure, and these occurrences are spelled out in the exclusion.

The instant case falls in line with *Bremerton, Cook*, and *Quadrant*.  Here, the initial peril that set in motion the causal chain was the polluting event: the application and storage of a potential pollutant (the manure).  Up until the point of using and storing the manure, no negligent act had occurred and, importantly, the exclusion explicitly extends to storage of waste.  As noted above, Plaintiffs' attempt to segregate the seepage event from the construction of the storage ponds, but this approach is unworkable and otherwise fails because storage is covered.  Indeed, the same splitting of hairs could be done with *Bremerton*, *Cook*, and *Quadrant* by arguing the failure to contain the fumes was negligence preceding the harm.  Such a reading would render the exclusion provision inert.  *Washington Public Utility Districts' Utilities System*, 112 Wash.2d at 11 (courts must not construe policy in a way that renders it ineffective).  Had the manure been released due to an accident not related to the actual use / storage of the pollutant – *e.g.*, accidentally driving a tractor into the barrier of the pond – the efficient cause rule may have applied.  But this is not the case.  The application and the storage *of the*

*manure* was the triggering event, and the insurance policy specifically

contemplates the exclusion of these occurrences.

## II.     **Duty to Defend**

An insurer's duty to defend is broader than the duty to indemnify and arises

when an action is first brought based on the *potential* for liability.  *Xia*, 2017 WL

3711907, at *4 (citation omitted).  Upon receipt of a complaint against its insured,

the insurer is permitted to utilize the "eight corners" rule to determine whether, on

the face of the complaint and the insurance policy, there is an issue of fact or law

that could conceivably result in coverage under the policy.  *Id*. (citation omitted).

"[I]f there is any reasonable interpretation of the facts or the law that could result

in coverage, the insurer must defend."  *Id.*  An insurer has no duty to defend "if the

alleged claims are clearly outside the policy's coverage."  *Id.* (citation omitted).

Here, because non-coverage was clear, Defendants did not have a duty to defend

Plaintiffs in the underlying litigation.

Plaintiffs attempt to muddy the water by pointing to the case of *Silver Creek

Pig*, where the court found pollution from pig manure was not excluded from

coverage under a policy containing a similar absolute pollution exclusion.

Plaintiffs argue that the mere existence of a conflicting opinion undermines the

clarity needed to avoid the duty to defend.  Plaintiffs are not correct.  *Silver Creek

Pig* does not create doubt giving rise to the duty to defend because the law

governing that decision conflicts greatly with Washington's approach to the absolute pollution exclusion.

Rather than determining whether the pollutant is acting as a pollutant, the relevant state law in *Silver Creek Pig* hinged on whether the pollutants were "non-natural occurring chemicals" and whether the harm was "traditional environmental pollution[.]" *Indemnity Insurance Company v. Silver Creek Pig, Inc.*, 2015 WL 1910019, at *10-11 (2015) (C.D. Ill. 2015).[8] This is not consistent with Washington law. The case of *Bremerton* is inconsistent with the "non-natural occurring chemicals test" because the sewage was not composed of non-natural chemicals. 92 Wash. App. at 19-23 (1998) (applying exclusion to sewage). The cases of *Cook, Quadrant,* and *Xia* are inconsistent with the "traditional environmental pollution" requirement because the fumes harmed persons, not the land or environment. *Cook*, 83 Wash. App. at 153-4 (fumes harming persons); *Quadrant*, 154 Wash.2d at 180 (same); *Xia*, 2017 WL 3711907, at *4 (same). Notably, the Court in *Quadrant* specifically held that the traditional environmental

---

[8]     The court in *Silver Creek Pig* conceded that the manure was a pollutant, but was not convinced that it fell under the exclusion because manure was not a "non-natural occurring chemical" and the complained of, noxious smell was not considered "traditional environmental pollution." *Id.*

harms is limited to the facts of *Kent Farms. Quadrant*, 154 Wash.2d at 183 ("if anything, the absence of that phrase instead indicates that the exclusionary language is not limited to traditional environmental harms."). In declining to adopt the "classic environmental pollution" requirement, the court in *Quadrant* reasoned that the contract made no such distinction between types of pollution (as is the case here). 154 Wash.2d at 175; *see also Cook*, 83 Wash. App. at 154 ("Nor does the exclusion limit its application to classic environmental pollution."). Irrespective, the underlying pollution in the instant case is traditional environmental pollution. Even the *Silver Creek Pig* court reached this conclusion with respect to the manure polluting the surrounding areas. 2015 WL 1910019, at *11.

In Washington, what matters is whether the substance causing harm was a pollutant acting as a pollutant. That is the case here. A different approach in another state does not create a lack of clarity where the underlying rules are much different and are clearly inconsistent with the approach in Washington.

Non-coverage is also clear despite Plaintiff's brief and conclusory contentions that the negligent application and storage was a covered occurrence that proximately caused the pollution. Here, as discussed above, the only relevant occurrences were directly related to the handling of the pollutant and were specifically excluded under the policy (*i.e.*, the dispersal / release of pollutants and storage of waste).

ORDER GRANTING DEFENDANTS' MOTIONS FOR
PARTIAL SUMMARY JUDGMENT; DENYING PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 25

**IT IS HEREBY ORDERED:**

1.  Defendants QBE Insurance Corporation and Unigard Insurance Company's Motions for Partial Summary Judgment (ECF No. 35) is **GRANTED**.

2.  Defendants Bedivere Insurance Company and Armour Risk Management, Inc.'s Motion for Partial Summary Judgment (ECF No. 38) is **GRANTED**.

3.  Plaintiffs' The Dolsen Companies, Cow Palace, LLC, and Three D Properties, LLC's Motion for Partial Summary Judgment (ECF No. 48) is **DENIED**.

The District Court Executive is directed to enter this Order and furnish copies to counsel.

**DATED** September 11, 2017.



THOMAS O. RICE
Chief United States District Judge

ORDER GRANTING DEFENDANTS' MOTIONS FOR
PARTIAL SUMMARY JUDGMENT; DENYING PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 26